[No. C029659. Third Dist. July 21, 2000.]

FRIENDS OF MAMMOTH et al., Plaintiffs and Appellants, v.
TOWN OF MAMMOTH LAKES REDEVELOPMENT AGENCY et al.,
Defendants and Respondents;
MAMMOTH MOUNTAIN SKI AREA et al., Interveners and
Respondents.

[No. C031043. Third Dist. July 21, 2000.]

FRIENDS OF MAMMOTH et al., Plaintiffs and Appellants, v.
TOWN OF MAMMOTH LAKES et al., Defendants and Respondents;
MAMMOTH MOUNTAIN SKI AREA et al., Interveners and
Respondents.

512

514

COUNSEL

Kane, Ballmer & Berkman, Murray O. Kane, R. Bruce Tepper, Jr., and Stephanie R. Scher for Plaintiffs and Appellants in Nos. C029659 and C031043.

McDonough, Holland & Allen and T. Brent Hawkins for the Counties of Del Norte, Humboldt, Kern, Lassen, Los Angeles, Madera, Merced, Nevada, Riverside, San Benito, Santa Clara, Santa Cruz, Tulare and Yolo as Amici Curiae on behalf of Plaintiffs and Appellants in No. C031043.

Peter E. Tracy, Town Attorney; Stephen M. Place; Sabo & Green, Charles R. Green, James C. Fedalen and William P. Medlen for Defendants and Respondents in Nos. C029659 and C031043.

Landels, Ripley & Diamond, Michael H. Zischke, Ted Stevens for the Cities of Albany, Bishop, Garden Grove, Hayward, Piedmont, San Juan Capistrano, Sierra Madre and Temple City as Amici Curiae on behalf of Defendants and Respondents in No. C029659.

Carol A. Korade for City of Alameda as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

Sonia R. Carvalho for Cities of Azusa and Claremont as Amici Curiae on behalf of Defendants and Respondents in No. C029659.

Bart J. Thiltgen for City of Bakersfield as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

Richard M. Manning for City of Capitola as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

Ronald R. Ball for City of Carlsbad as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

Michael G. Colantuono for City of Cudahy as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

Alan J. Peake for City of Delano as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

Michael Jenkins for the Cities of Diamond Bar and West Hollywood as Amici Curiae on behalf of Defendants and Respondents in No. C029659.

Brad L. Fuller for City of Eureka as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

Harvey E. Levine for City of Fremont as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

Linda A. Callon for City of Gilroy as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

John R. Harper for City of Grand Terrace as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

Francis R. Ruggieri for City of Gustine as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

David R. McEwen for City of Lancaster as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

Charles J. Williams for City of Lafayette as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

Thomas R. Curry for City of Livermore as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

Randall A. Hays for City of Lodi as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

Robert E. Shannon for City of Long Beach as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

Joseph A. Soldani for City of Madera as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

Steven F. Nord for City of Merced as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

Anthony Canzoneri for City of Monterey Park as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

Robert D. Herrick for City of Moreno Valley as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

William B. Conners for City of Monterey as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

Michael D. Martello for City of Mountain View as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

John R. Harper for the Cities of Murrieta and Norco as Amici Curiae on behalf of Defendants and Respondents in No. C029659.

Jayne W. Williams for City of Oakland as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

David J. Erwin for City of Palm Desert as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

Scott Nichols for the Cities of Pico Rivera and Walnut as Amici Curiae on behalf of Defendants and Respondents in No. C029659.

Carol B. Tanenbaum for City of Placentia as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

Stephen M. Ecais for City of Poway as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

W. Leonard Wingate for City of Redding as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

Daniel J. McHugh for City of Redlands as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

Robert A. Owen for City of Rialto as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

Hadden Roth for Town of Ross and City of San Anselmo as Amici Curiae on behalf of Defendants and Respondents in No. C029659.

Robert J. Lanzone for City of San Carlos as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

Brian M. Libow for City of San Pablo as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

Phillip H. Bomney for City of Santa Paula as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

Rene A. Chouteau for City of Santa Rosa as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

Scott S. Smith for City of Santee as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

Valerie J. Armento for City of Sunnyvale as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

Ann R. Danforth for Town of Tiburon as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

Debra E. Corbet for City of Tracy as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

Charles O. Lamoree for City of Vacaville as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

Henry R. Kraft for City of Victorville as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

Larry G. Bacon for City of Yreka as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

Naomi Silvergleid for Town of Yucca Valley as Amicus Curiae on behalf of Defendants and Respondents in No. C029659.

Rollston, Henderson, Rasmussen & Crabb and J. Dennis Crabb for Town of Truckee as Amicus Curiae on behalf of Defendants and Respondents in No. C031043.

Michael Jenkins; Richards, Watson & Gershon, T. Peter Pierce and Steven R. Orr for the Cities of Alameda, Albany, Avalon, Bakersfield, Bishop, Carson, Cerritos, Delano, Diamond Bar, Dinuba, Hollister, Huron, Long Beach, Los Altos, Monterey Park, Mountain View, Oceanside, Orange Cove, Pico Rivera, Piedmont, Ripon, Ross, San Anselmo, San Bruno, San Buenaventura, Seaside, Walnut and Wasco, the Barstow Redevelopment Agency and the Bishop Redevelopment Agency as Amici Curiae on behalf of Defendants and Respondents in No. C031043.

David S. Baumwohl for Interveners and Respondents Mammoth Mountain Ski Area and Mammoth Mountain Land Corporation in Nos. C029659 and C031043.

Liebersbach, Mohun, Carney & Reed, R. Mark Carney and James S. Reed for Interveners and Respondents Intrawest Mammoth Corporation in Nos. C029659 and C031043.

## OPINION

**NICHOLSON, J.**—In this consolidated appeal, we address challenges to a redevelopment plan adopted by the Town of Mammoth Lakes and the environmental analysis performed on that plan. The trial court determined both the environmental analysis and the redevelopment plan complied with governing law. We disagree, and reverse both the trial court's judgment upholding the environmental analysis and the trial court's judgment on the validity of the redevelopment plan. Our decision also nullifies the trial court's denial of motions to tax costs in the two actions below.

### FACTS

In March of 1996, defendants Town of Mammoth Lakes and Town of Mammoth Lakes Redevelopment Agency (Agency; collectively, the Town) began the process established by the Community Redevelopment Law (Health & Saf. Code, § 33000 et seq.) to adopt a redevelopment plan. Part of this process included the preparation of an environmental impact report (EIR) pursuant to the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.).

On June 18, 1997, both the Agency's governing board of directors and the town council certified the EIR. The Agency also approved the proposed redevelopment plan and its accompanying report (the Final Report) and forwarded the documents to the town council. On July 2, 1997, the town council adopted Ordinance No. 97-08 approving the redevelopment plan.

The redevelopment plan applied to a project area consisting of three areas of land totaling over 1,100 acres: a main area of about 907 acres; subarea 1 consisting of a 30-acre industrial park; and subarea 2 consisting of the approximately 200-acre airport (collectively, the Project Area). Subareas 1 and 2 were not contiguous to the main area or to each other.

The main area contains the Town's traditional downtown commercial area as well as approximately 1,200 units of housing, about half of which are condominiums. It also encompasses a site designated for development of a community college and portions of three partially developed recreational resort areas: Lodestar at Mammoth, Juniper Ridge and North Village. The college site, the resort areas and the airport were the subjects of significant

proposed development and corresponding environmental review approved before the redevelopment plan was adopted. Most of that proposed development had not occurred, however, by the time the Town adopted the redevelopment plan.

Plaintiffs Friends of Mammoth, Andrea M. Lawrence, Patricia Savage and Pat Eckart (collectively plaintiffs) filed two actions challenging the Town's adoption of the redevelopment plan. The first (case No. C029659 on appeal) was a petition for writ of mandate against the Agency and the Town claiming the redevelopment plan EIR failed to comply with the requirements of CEQA. The second (case No. C031043 on appeal) was a validation action under Code of Civil Procedure section 860 et seq. against the Town, the Agency, and all persons interested in the adoption of the redevelopment plan, claiming the redevelopment plan did not comply with the requirements of the Community Redevelopment Law.

By judgment dated May 5, 1998, the trial court denied the CEQA mandate petition and awarded costs to the Town. By judgment dated October 21, 1998, the trial court also determined the redevelopment plan was valid, ordered plaintiffs take nothing by their complaint, and awarded costs to the Town. Plaintiffs filed motions to tax costs in each case, both of which were denied in full by the trial court. Plaintiffs timely appealed each judgment. We consolidated the appeals on plaintiffs' motion.[1] We will provide additional facts as required.[2]

---

[1] Also appearing in both appeals are interveners Mammoth Mountain Ski Area, Mammoth Mountain Land Corporation and Intrawest Mammoth Corporation.

The following cities and towns appear in case No. C029659 in support of defendants: Albany, Alameda, Azusa, Bakersfield, Bishop, Capitola, Carlsbad, Claremont, Cudahy, Delano, Diamond Bar, Eureka, Fremont, Garden Grove, Gilroy, Grand Terrace, Gustine, Hayward, Lancaster, Lafayette, Livermore, Lodi, Long Beach, Madera, Merced, Monterey, Monterey Park, Moreno Valley, Mountain View, Murrieta, Norco, Oakland, Palm Desert, Pico Rivera, Piedmont, Placentia, Poway, Redding, Redlands, Rialto, Ross, San Anselmo, San Carlos, San Juan Capistrano, San Pablo, Santa Paula, Santa Rosa, Santee, Sierra Madre, Sunnyvale, Temple City, Tiburon, Tracy, Vacaville, Victorville, Walnut, West Hollywood, Yreka, and Yucca Valley.

The following counties appear in case No. C031043 in support of plaintiffs: Del Norte, Humboldt, Kern, Lassen, Los Angeles, Madera, Merced, Nevada, Riverside, San Benito, Santa Clara, Santa Cruz, Tulare, and Yolo (collectively Amicus Counties).

The following cites, towns and redevelopment agencies appear in case No. C031043 in support of defendants: Alameda, Albany, Avalon, Bakersfield, Barstow Redevelopment Agency, Bishop, Bishop Redevelopment Agency, Carson, Cerritos, Delano, Diamond Bar, Dinuba, Hollister, Huron, Long Beach, Los Altos, Monterey Park, Mountain View, Oceanside, Orange Cove, Pico Rivera, Piedmont, Ripon, Ross, San Anselmo, San Bruno, San Buenaventura, Seaside, Truckee, Walnut, and Wasco.

[2] Plaintiffs and Amicus Counties submitted separate requests to take judicial notice of various items. Pursuant to Evidence Code sections 451, 452, and 459, and our ruling in

CEQA Appeal (Case No. C029659)

I

*Standard of Review*

██ We review the Town's decision certifying the redevelopment plan EIR to determine "whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (Pub. Resources Code, § 21168.5; see also *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 567-568 [38 Cal.Rptr.2d 139, 888 P.2d 1268].)

"On appeal, our task is the same as the trial court's, 'that is, to review the agency's actions to determine whether the agency complied with the procedures required by law.' [Citation.] The trial court's conclusions are not binding on us." (*Davidon Homes v. City of San Jose* (1997) 54 Cal.App.4th 106, 113-114 [62 Cal.Rptr.2d 612].) Nevertheless, the EIR is presumed adequate, and plaintiffs bear the burden of proving otherwise. (Pub. Resources Code, § 21167.3; *State of California v. Superior Court* (1990) 222 Cal.App.3d 1416, 1419 [272 Cal.Rptr. 472].)

II

*Adequacy of EIR's Analysis of Proposed Redevelopment Projects*

██ Plaintiffs claim the EIR violated CEQA, and particularly Public Resources Code section 21090, by failing to analyze the indirect or secondary environmental impacts likely to be caused by each of the proposed redevelopment projects included in the redevelopment plan. For the reasons that follow, we agree.

If a redevelopment agency desires to use its funds to purchase land or to construct public buildings, facilities or other improvements which will assist in eliminating blight, Health and Safety Code section 33445 requires the redevelopment agency to provide for the "acquisition of property and installation or construction of *each* facility" in the redevelopment plan. (Health & Saf. Code, § 33445, subd. (b), italics added.) The redevelopment agency

*People v. Patterson* (1999) 72 Cal.App.4th 438, 442-445 [84 Cal.Rptr.2d 870], we grant plaintiffs' request in its entirety, and we grant Amicus Counties' request except as to items 1.e., 1.h., 1.k., 1.l., 1.m., and 1.o.

must also list in its Final Report the "specific projects then proposed by the agency" to eliminate blight. (Health & Saf. Code, § 33352, subd. (a).)

Complying with these requirements, the Town's redevelopment plan "specifically authorized" the Agency "to provide or participate in providing" at least 72 separate and identified public improvements and facilities.[3] The projects read like a municipal wish list. They include an overhead gondola; an expanded community library and meeting hall; a town amphitheater; a 300-seat performing arts theater; a school gymnasium; two 2,000-square-foot childcare facilities; a combined fire, police, and emergency operations center; an aquatics center, including an 8-lane 25-yard pool; a conference and ice skating arena; a 20,000-square-foot recreation center; airport runway and taxiway extensions to serve commercial jet aircraft; an expanded airport terminal; and over 2,800 parking spaces in new underground and above-ground parking structures and lots.

The projects include constructing approximately 400 new housing units; upgrading all Town utilities; undergrounding all overhead utility lines; developing a central propane distribution system for commercial areas; installing fiber optic cable throughout the Project Area; developing a geo-thermal heating system for commercial and public uses; upgrading sewer lines; improving storm drains; and installing various road and pedestrian improvements. The projects also include establishing loan programs to assist in rehabilitating older hotels, improving building facades, and recruiting and retaining businesses. They also propose acquiring various parcels of real property to assist in developing commercial and tourist-oriented uses, including the relocation of certain existing gas stations.

The redevelopment plan states "changes in circumstances or designs may alter the location of any of the facilities described above, or require other related facilities." The plan is valid for 30 years.

In the Final Report, the Agency briefly described each proposed project, explained how each would address blight, and estimated each project's cost. The Agency projected the total cost of the projects would exceed $136.4 million. The Agency also prepared a "conceptual" map depicting where most of the projects would be located.

---

[3] The redevelopment plan EIR lists 72 development projects, but the redevelopment plan itself lists 73 separate projects and uses. Further, the Final Report lists 81 separate projects. In their briefs, the parties refer to the proposals as 72, and for the sake of consistency, so do we.

The redevelopment plan EIR was prepared as a "program EIR" pursuant to Guidelines section 15168.[4] ▮▮ ▮▮ ▮▮ The redevelopment plan EIR did not analyze direct or indirect environmental impacts potentially caused by each of the 72 development proposals. The EIR states: "Due to the fact that specific characteristics of individual projects which may result from this Plan are unknown at this time, potential environmental impacts are addressed in general terms." The redevelopment plan EIR thus analyzed primarily the cumulative impacts that could foreseeably occur if all of the proposed projects were actually developed. Much of this analysis was contained in the Town's general plan and general plan EIR as well as other previously prepared planning documents and supporting environmental reviews and was incorporated into the redevelopment plan EIR by reference.

Table 3-2 of the EIR, Proposed Uses and Actions, lists all of the 72 development projects and their locations, provides a brief description of each project, and explains how each alleviates blight. Exhibit 3-4 of the EIR is the same map noting the location of the proposed projects as that included in the Final Report. The EIR further explains the map does not include "projects which are program oriented or are district-wide . . . ."

The EIR states "[i]ndividual improvement and redevelopment/development projects would occur in incremental phases over time, based largely on economic consideration, infrastructure improvements, market demand and other planning considerations. The phasing and exact details of each development would be evaluated by the Town of Mammoth Lakes Redevelopment Agency on a case-by-case basis. [¶] . . . All [of the 72 development projects] may be subject to additional environmental review on an individual Redevelopment Plan basis, in accordance with the provisions of Section 15168 of CEQA [Guidelines], as determined necessary by the Town of Mammoth Lakes."

At trial, plaintiffs argued the Town violated CEQA by preparing an "ordinary 'program EIR' " for the redevelopment plan. Because Public Resources Code section 21090 restricted subsequent environmental review of development activities performed pursuant to the redevelopment plan but

---

[4]"Guidelines" refers to the state CEQA Guidelines, certified and adopted by the Secretary of the California Resources Agency pursuant to Public Resources Code section 21083 and codified at California Code of Regulations, title 14, chapter 3 (Cal. Code Regs., tit. 14, §§ 15000-15387.) Although our Supreme Court has not yet decided whether the Guidelines are regulatory mandates or only interpretive aids, it has instructed us to "afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 391, fn. 2 [253 Cal.Rptr. 426, 764 P.2d 278].)

the regulations governing program EIR's did not, plaintiffs argued that the Town was obligated to gather and analyze in the EIR as much information about the 72 development proposals as possible instead of deferring such specific review to later.

The trial court rejected plaintiffs' argument. It reasoned the statutory and regulatory scheme equated redevelopment plan EIR's with program EIR's and required the Town to prepare a program EIR. That scheme also did not foreclose future environmental review to the extent plaintiffs feared. The 72 development proposals were just proposals, and CEQA would require the Town to perform additional environmental review should the proposals actually come to fruition and involve new information.

Before us, plaintiffs claim the trial court misstated their argument. Because the Town chose to include the 72 development proposals in the redevelopment plan, plaintiffs assert, Public Resources Code section 21090 required the Town to analyze each of the proposals in the EIR (1) to the same extent CEQA requires analysis of impacts normally associated with general plans, and (2) based on all information available to the Town at that time concerning each of the 72 proposals. The Town was not free, they argue, to defer this analysis merely because it prepared a program EIR. Plaintiffs believe under Public Resources Code sections 21090 and 21166 the information available when the redevelopment plan EIR was certified could preclude further environmental review of the 72 development proposals' direct and indirect impacts when the proposed projects are actually developed.

To understand the significance of Public Resources Code section 21090 and determine its scope, we first review how CEQA defines a "project" and accommodates projects of various scope and size by providing for different types of EIR's. We then review the level of detail and analysis CEQA requires of EIR's. We will then apply the principles gleaned from this review to determine the level of review CEQA required of the Town's redevelopment plan EIR.

To the extent any statutory construction is necessary, we interpret Public Resources Code section 21090 according to the traditional rules of statutory construction. ■ Although "the Legislature intended [CEQA] to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language" (*Friends of Mammoth v. Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049], disapproved on other grounds by *Kowis v. Howard*

(1992) 3 Cal.4th 888, 896-897 [12 Cal.Rptr.2d 728, 838 P.2d 250]), CEQA itself states "[i]t is the intent of the Legislature that courts, consistent with generally accepted rules of statutory interpretation, shall not interpret [CEQA] or the [Guidelines] in a manner which imposes procedural or substantive requirements beyond those explicitly stated in [CEQA] or in the [Guidelines]." (Pub. Resources Code, § 21083.1.)

In general, CEQA requires a government agency to prepare an EIR before approving or carrying out any discretionary "project" the agency determines may have a significant effect on the environment. (Pub. Resources Code, § 21080, subds. (a), (d).) A "project" is any "activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is [among other possibilities] [a]n activity directly undertaken by any public agency." (Pub. Resources Code, § 21065; see also Guidelines, § 15378, subd. (a).)[5]

CEQA applies when a public agency proposes to "approve" a project. (Pub. Resources Code, § 21080, subd (a); Guidelines, § 15352.) An "approval" is "the decision by a public agency which commits the agency to a definite course of action in regard to a project intended to be carried out by any person." (Guidelines, § 15352, subd. (a).)

CEQA applies to many types of projects, ranging from the approval of a single use permit for construction of a building to the approval of a local general plan. (Guidelines, § 15378, subd. (a)(1).) To accommodate the different types of projects to which it applies, CEQA provides different types of EIRs and accompanying procedures that can be used depending upon the type, specificity, and known detail of the proposed project under review.

The project EIR is the most common and detailed type of EIR. It "examines the environmental impacts of a specific development project. This type

---

[5]"(1) A direct physical change in the environment is a physical change in the environment which is caused by and immediately related to the project. Examples of direct physical changes in the environment are the dust, noise, and traffic of heavy equipment that would result from construction of a sewage treatment plant and possible odors from operation of the plant.

"(2) An indirect physical change in the environment is a physical change in the environment which is not immediately related to the project, but which is caused indirectly by the project. If a direct physical change in the environment in turn causes another change in the environment, then the other change is an indirect physical change in the environment. For example, the construction of a new sewage treatment plant may facilitate population growth in the service area due to the increase in sewage treatment capacity and may lead to an increase in air pollution.

"(3) An indirect physical change is to be considered only if that change is *a reasonably foreseeable impact which may be caused by the project*. A change which is speculative or unlikely to occur is not reasonably foreseeable." (Guidelines, § 15064, subd. (d), italics added.)

of EIR should focus primarily on the changes in the environment that would result from the development project. The EIR shall examine all phases of the project including planning, construction, and operation." (Guidelines, § 15161.)

Once a project EIR has been certified by the lead agency, Public Resources Code section 21166 *prohibits* an agency from requiring additional environmental review in an EIR on that project unless at least one of three events occurs: "(a) Substantial changes are proposed in the project which will require major revisions of the environmental impact report. [¶] (b) Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report. [¶] (c) New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available." (Pub. Resources Code, § 21166; see also Guidelines, §§ 15162, 15163.)

In contrast, for projects consisting of a policy, plan, program or ordinance, CEQA encourages agencies to "tier" EIR's and provides a number of ways to do so. "Tiering" is "the coverage of general matters and environmental effects in an environmental impact report prepared for a policy, plan, program or ordinance followed by narrower or site-specific environmental impact reports which incorporate by reference the discussion in any prior environmental impact report and which concentrate on the environmental effects which (a) are capable of being mitigated, or (b) were not analyzed as significant effects on the environment in the prior environmental impact report." (Pub. Resources Code, § 21068.5.)

The standard for determining whether to engage in additional CEQA review for subsequent projects under a tiered EIR is more relaxed than the prohibition against additional review imposed by Public Resources Code section 21166 for project EIR's. For a subsequent project that is consistent with the program or plan analyzed in a first tier EIR, CEQA requires a lead agency to prepare an initial study to determine if the later project may cause significant environmental effects not examined in the first tier EIR. If the later project will cause such effects, the lead agency must prepare another EIR. (Pub. Resources Code, § 21094, subds. (a), (c).)[6]

If the subsequent project is not consistent with the program or plan, it is treated as a new project and must be fully analyzed in a project—or another

---

[6]This second tier EIR need only analyze those significant effects of the later project which were either not mitigated or avoided as a result of the first tier EIR or were not examined at a sufficient level of detail in the first tier EIR to enable those effects to be mitigated or avoided by site-specific revisions, the imposition of conditions, or by other means in connection with the later approval. (Pub. Resources Code, § 21094; Guidelines, § 15152.)

tiered EIR if it may have a significant effect on the environment. If the subsequent project is actually the same project reviewed in the first tier EIR, it cannot be subject to further environmental review in an EIR unless the requirements of Public Resources Code section 21166 are satisfied. (Pub. Resources Code, § 21094, subd. (b); *Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307, 1319-1321 [8 Cal.Rptr.2d 473].)

Now we come to the application of CEQA to a proposed redevelopment plan. Local government agencies establish redevelopment agencies and adopt redevelopment plans to improve, rehabilitate, and redevelop blighted areas. (Health & Saf. Code, § 33131.) "As the fundamental document governing a redevelopment agency's activities, a redevelopment plan basically acts as the agency's charter. Adopted by the local legislative body (a city council or county board of supervisors), the plan establishes long-term planning goals as well as implementation policies and procedures for the redevelopment of a designated project area. It also serves as a financing plan by authorizing the agency's use of particular financing tools to implement projects and polices. A redevelopment plan may also establish certain limitations on the authority of a redevelopment agency to conduct activities within a project area. A redevelopment plan is typically a very general document, providing the agency with great flexibility." (Beatty et al., Redevelopment in Cal. (2d ed. 1995) at p. 25.)

"By exercising certain of its powers to implement redevelopment, a redevelopment agency may induce private investment in an area. The success of any redevelopment project is dependent upon whether private lenders, developers, owners, and tenants can be persuaded to participate in the process. Thus, a redevelopment agency is unique among public entities since in order to achieve its objective of eliminating blight it must rely upon cooperation with the private sector. Redevelopment is also a process which occurs over a period of years. These realities dictate that a redevelopment plan be written in terms that enhance a redevelopment agency's ability to respond to market conditions, development opportunities and the desires and abilities of owners and tenants. Such a plan then cannot always outline in detail each project that a redevelopment agency will undertake during the life of the plan." (*County of Santa Cruz v. City of Watsonville* (1985) 177 Cal.App.3d 831, 841 [223 Cal.Rptr. 272].)

The redevelopment plan must conform to the local agency's general plan, including the general plan's land use and housing elements. (Health & Saf. Code, § 33367, subd. (d)(4).) As stated earlier, a redevelopment plan must name each public facility the redevelopment agency desires to provide or

land it seeks to acquire to help alleviate blight. (Health & Saf. Code, § 33445.) It must also contain the approximate amount of open space to be provided; limitations on the type, size, height, number, and proposed use of buildings; the approximate number of dwelling units to be provided, and a description of property to be devoted to public purposes and the nature of such purposes. (Health & Saf. Code, § 33333, subds. (a)-(d).)

The Community Redevelopment Law authorizes redevelopment plans to remain valid for many years. If the redevelopment plan authorizes the redevelopment agency to use tax increment financing, as is the case here, the duration of the redevelopment plan may run as long as, but cannot exceed, 30 years. (Health & Saf. Code, § 33333.2, subd. (a)(2).) Indebtedness to be repaid out of tax increments cannot be established beyond 20 years from the plan's adoption and must be repaid within 45 years of the plan's adoption. (Health & Saf. Code, § 33333.2, subd. (a)(1), (3).) Also, any eminent domain proceedings to acquire property within the redevelopment project area must be commenced within 12 years of the plan's adoption. (Health & Saf. Code, § 33333.2, subd. (a)(4).)

▆▆ Based on the above, a redevelopment plan at first blush would appear to be an ideal candidate for a first tier EIR, with all projects implemented pursuant to the redevelopment plan being subject to their own additional and project-specific EIR's. By adopting Public Resources Code section 21090, however, the Legislature determined a redevelopment plan EIR and all public and private projects implemented pursuant to that plan should be treated as a single project for purposes of CEQA. The statute reads in its entirety: "For all purposes of this division [CEQA], all public and private activities or undertakings pursuant to, or in furtherance of, a redevelopment plan shall be deemed to be a single project. However, further environmental review of any public or private activity or undertaking pursuant to, or in furtherance of, a redevelopment plan shall be conducted if any of the events specified in [Public Resources Code] Section 21166 have occurred."

Guidelines section 15180 implements Public Resources Code section 21090 as follows: "(a) All public and private activities or undertakings pursuant to or in furtherance of a redevelopment plan constitute a single project, which shall be deemed approved at the time of adoption of the redevelopment plan by the legislative body. . . . [¶] (b) An EIR on a redevelopment plan shall be *treated as a program EIR* with no subsequent EIRs required for individual components of the redevelopment plan unless a subsequent EIR or a supplement to an EIR would be required by [Guidelines] Section 15162 or 15163." (Italics added.) (Guidelines §§ 15162 and

15163 implement Pub. Resources Code, § 21166's prohibition of additional environmental review after a project EIR has been certified unless significant change occurs or significant new information develops.)

The program EIR referenced in Guideline section 15180 is a type of tiered EIR authorized by the Guidelines but not by the statute. (*Al Larson Boat Shop, Inc. v. Board of Harbor Commissioners* (1993) 18 Cal.App.4th 729, 740 [22 Cal.Rptr.2d 618].) "A program EIR is an EIR which may be prepared on a series of actions that can be characterized as one large project and are related . . . : [¶] . . . [¶] . . . [i]n connection with issuance of rules, regulations, plans, or other general criteria to govern the conduct of a continuing program . . . ." (Guidelines, § 15168, subd. (a)(3).)

A program EIR is designed to "(1) Provide an occasion for a more exhaustive consideration of effects and alternatives than would be practical in an EIR on an individual action, [¶] (2) Ensure consideration of cumulative impacts that might be slighted in a case-by-case analysis, [¶] (3) Avoid duplicative reconsideration of basic policy considerations, [¶] (4) Allow the lead agency to consider broad policy alternatives and program wide mitigation measures at an early time when the agency has greater flexibility to deal with basic problems or cumulative impacts, [and] [¶] (5) Allow reduction in paperwork." (Guidelines, § 15168, subd. (b).)

The Legislature's transformation of a redevelopment plan EIR from what would otherwise be a first tier EIR into a project/program EIR is not without significance. Were it not for Public Resources Code section 21090 and Guidelines section 15180, all activities and subsequent development projects approved pursuant to a redevelopment plan would likely be treated as separate projects and would be subject to environmental review for *any* potentially significant environmental impacts not previously analyzed in the redevelopment plan EIR. (Pub. Resources Code, § 21094.)

Because of Public Resources Code section 21090 and Guidelines section 15180, further environmental review in an EIR of any development project implemented pursuant to or in furtherance of a redevelopment plan is prohibited unless *significant* changes occur in the project or the circumstances surrounding the project, or if *significant* new information which was not known and could not have been known when the redevelopment plan EIR was certified becomes available. (See *Long Beach Sav. & Loan Assn. v. Long Beach Redevelopment Agency* (1986) 188 Cal.App.3d 249, 266 [232 Cal.Rptr. 772] [additional EIR not required where redevelopment project did not cause significant changes to project as analyzed in previous redevelopment EIR].)

It is this fear that the 72 proposed projects will avoid detailed CEQA review as a result of the operation of Public Resources Code section 21090 that forms the crux of plaintiffs' petition. They claim enough information was known (e.g., each project's proposed use and location), or could have been known, when the EIR was certified to prevent future environmental analysis at least of these aspects of the development proposals when the proposals are actually developed. They thus argue section 21090 required the Town "to gather every bit of information known at the time of [the] Redevelopment Plan adoption about the 72 proposed projects which are included in the Redevelopment Plan [and] to conduct environmental analysis of those Development Proposals to the extent [of] the information then available . . . ."

They claim the analysis was not to be a detailed, site-specific analysis. It was, however, to be governed by the information available at the time of the redevelopment plan's adoption, then "tempered" by focusing on each pro-posal's secondary effects similar to those discussed in an EIR for a general plan. Plaintiffs further cite specific instances where additional information about a few of the proposed projects was allegedly available to the Town, but the Town did not obtain the data for use in the EIR.

The language of Public Resources Code section 21090 does not expressly increase the level of analysis required in a redevelopment plan EIR above that required of other types of program EIR's. However, by defining a redevelopment plan and all of its proposed projects as a single project, the Legislature implied that as much environmental review as possible should occur at the outset of the redevelopment process, with subsequent review limited to situations where significant changes or "new information" on the plan's constituent projects becomes available.

The Town and its supporting amici curiae mischaracterize the redevelop-ment plan EIR as a first tier EIR. As shown above, first tier EIR's are not subject to the ban on subsequent EIR's imposed by Public Resources Code section 21166. Thus, courts have allowed first tier EIR's to defer detailed analysis to subsequent project EIR's. (See *Al Larson Boat Shop, Inc. v. Board of Harbor Commissioners, supra,* 18 Cal.App.4th at pp. 746-747; Guidelines, § 15152, subd. (c).)

Here, to the extent specific information is now known about one of the proposed 72 development projects, Public Resources Code section 21090 will prevent a project EIR from analyzing impacts derived from that aspect when the project is subsequently developed. While the redevelopment plan

EIR may be a type of tiered EIR (Guidelines, § 15152, subd. (h)), it does not enjoy all of the flexibility accorded first tier EIR's.

In its respondents' brief, the Town emphasized Guidelines section 15168, subdivision (c)(1), as requiring the Town to perform additional environmental review of the development projects for impacts not reviewed in the redevelopment plan EIR. We initially disagreed. On petition for rehearing, the Town now argues subdivision (c)(1) must be read together with subdivision (c)(2). Doing so does not further the Town's argument.

Subdivision (c) of Guidelines section 15168 concerns the performance of subsequent environmental review on activities implemented pursuant to a program EIR. The subdivision reads in its entirety: "Use with Later Activities. Subsequent activities in the program must be examined in the light of the program EIR to determine whether an additional environmental document must be prepared. [¶] (1) If a later activity would have effects that were not examined in the program EIR, a new initial study would need to be prepared leading to either an EIR or a negative declaration. [¶] (2) If the agency finds that pursuant to [Guidelines] Section 15162, no new effects could occur or no new mitigation measures would be required, the agency can approve the activity as being within the scope of the project covered by the program EIR, and no new environmental document would be required."

The Town argues application of subdivision (c)(1) of Guidelines section 15168 would result in a new EIR only if one of the three conditions in section 21166 and Guidelines section 15162 occurred. If that is so, then this regulation is further evidence that significant environmental impacts discernable from information known now must be reviewed now in an EIR. Otherwise, section 21166 and Guidelines section 15168, subdivision (c)(2), will prohibit the Town from reviewing those impacts in a subsequent EIR.

Designating an EIR as a program EIR also does not by itself decrease the level of analysis otherwise required in the EIR. "All EIR's must cover the same general content. (Guidelines, §§ 15120-15132.) The level of specificity of an EIR is determined by the nature of the project and the 'rule of reason' [citation], rather than any semantic label accorded to the EIR." (*Al Larson Boat Shop, Inc. v. Board of Harbor Commissioners, supra,* 18 Cal.App.4th at pp. 741-742, fn. omitted.)

 In fact, the Guidelines do not specify the level of analysis to be performed in a program EIR. Similar to a first tier EIR, a program EIR is

designed for analyzing program-wide effects, broad policy alternatives and mitigation measures, cumulative impacts and basic policy considerations, as opposed to specific projects within the program. (Guidelines, § 15168, subd. (b)). However, the Guidelines also state a program EIR "will be most helpful in dealing with subsequent activities if it deals with the effects of the program *as specifically and comprehensively as possible.* With a good and detailed analysis of the program, many subsequent activities could be found to be within the scope of the project described in the program EIR, and no further environmental documents would be required." (Guidelines, § 15168, subd. (c)(5), italics added.)

In general, "[a]n EIR should be prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences. An evaluation of the environmental effects of a proposed project need not be exhaustive, but the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible. . . . The courts have looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure." (Guidelines, § 15151.)

"No ironclad rules can be imposed regarding the level of detail required . . . . EIR requirements must be 'sufficiently flexible to encompass vastly different projects with varying levels of specificity.' [Citation.]" (*Al Larson Boat Shop, Inc. v. Board of Harbor Commissioners, supra,* 18 Cal.App.4th at pp. 745-746.)

Accordingly, the Guidelines describe the level of analysis and detail for an EIR as follows: "The degree of specificity required in an EIR will correspond to the degree of specificity involved in the underlying activity which is described in the EIR. [¶] (a) An EIR on a construction project will necessarily be more detailed in the specific effects of the project than will be an EIR on the adoption of a local general plan or comprehensive zoning ordinance because the effects of the construction can be predicted with greater accuracy. [¶] (b) An EIR on a project such as the adoption or amendment of a comprehensive zoning ordinance or a local general plan should focus on the secondary effects that can be expected to follow from the adoption, or amendment, but the EIR need not be as detailed as an EIR on the specific construction projects that might follow." (Guidelines, § 15146.)

We cannot determine as a matter of law which of CEQA's various levels of review applies to all redevelopment plan EIR's. A redevelopment

plan may be as conceptual as a general plan, as detailed as a conditional use permit, or, as in this case, somewhere in between. Nevertheless, because a redevelopment plan EIR is not a true first tier EIR, and because the Town's redevelopment plan was as detailed as it was, CEQA required the Town's redevelopment plan EIR to contain more analysis of the 72 proposed projects than it did. The Town's failure to analyze the impacts caused by each proposed project, to the extent information was known or reasonably could have been known about each project, constituted a failure to proceed in the manner required by CEQA.

The Town argues it should not be required to review each of the proposed development projects because the project being approved was the redevelopment plan, not the individual projects. This argument fails to reckon with the full meaning of the fact that a redevelopment plan, including all "public and private activities or undertakings pursuant to, or in furtherance of," the plan, "shall be deemed to be a single project" under CEQA. (Pub. Resources Code, § 21090.) By adopting the redevelopment plan and certifying the EIR, the Town committed itself to the "definite course of action" of implementing the redevelopment plan. (Guidelines, § 15352, subd. (a).) It is at least "reasonably foreseeable" the Town will do so by developing at least some of the 72 development projects already approved in the redevelopment plan. This is particularly true since the Town will have to amend the redevelopment plan if it desires to develop any other project not now named in the plan. (Health & Saf. Code, § 33445, subd. (b).)

The Town claims the 72 development projects had only recommended sites and descriptions, and thereby bore insufficient detail to justify conducting environmental review on any of them individually. In fact, the list, explanation and map of the projects contained in the redevelopment plan, the Final Report, and in the EIR demonstrate that many, if not most, of the development projects were defined and formulated with great specificity, including locations, functions, sizes and capacities. The mere fact that changed circumstances could produce changes in the details of the proposals does not render the proposals too vague or indefinite to be reviewed in an EIR such as this.

In fact, it is the detail with which the Town defines the development projects that compels our decision here. For example, the redevelopment plan calls for construction of a 500-car parking structure at the Juniper Ridge resort; 1,500 parking spaces in structures or lots at the North Village resort; a 250-car parking structure at the Lodestar resort; two 200-car parking

structures behind Main Street; and 100-car, 50-car, and 30-car surface parking lots. The conceptual map designates the proposed locations for these different parking lots or structures.

By adopting the redevelopment plan, these projects are deemed approved for purposes of CEQA, and no additional EIR's analyzing any of the projects' significant impacts may be required for them unless the requirements of Public Resources Code section 21166 are met. The redevelopment plan EIR does not analyze any significant environmental impacts potentially caused by these projects individually as a result of their proposed use or location. If the Town develops these projects as approved and described in the redevelopment plan, Public Resources Code sections 21090 and 21166 will prohibit the Town from analyzing these projects' significant impacts arising from their use and location, since that information was known or could have been known when the redevelopment plan EIR was certified.

The Town notes the redevelopment plan EIR states the 72 development projects *"may* be subject to additional environmental review on an individual Redevelopment Plan basis, in accordance with the provisions of [Guidelines] Section 15168 of CEQA . . . ." (Italics added.) As already demonstrated, CEQA will prohibit additional EIR's analyzing the individual projects' significant effects unless the projects or their circumstances change significantly or significant new information which could not have been known when the redevelopment plan EIR was certified comes to light. This statement in the EIR thus offers no guarantee that potential significant impacts reasonably foreseeable now will be analyzed prior to actual development.

At this stage, it may not be possible to conduct a complete analysis of each of these projects because not enough may be known. However, because each project is deemed approved for purposes of CEQA, the significant impacts to the environment likely to be caused by each individual project must be analyzed in the redevelopment plan EIR at least to the same extent each project is detailed in the redevelopment plan and its accompanying Final Report. Otherwise, such analysis may never occur, and nothing in Public Resources Code section 21090 demonstrates the Legislature intended to *exempt* individual development projects approved in a redevelopment plan and their impacts from environmental analysis under CEQA.

Amici curiae supporting the Town argue a ruling in plaintiffs' favor would deprive municipalities of the ability to use a program EIR in order to streamline environmental review for redevelopment projects. We disagree.

Our ruling merely clarifies what must be included in a redevelopment plan EIR in order for it to obtain the procedural benefits CEQA grants a program EIR without violating the requirement of Public Resources Code section 21090.

Amici curiae complain our ruling will make redevelopment planning significantly more complicated and expensive, resulting in fewer redevelopment proposals coming to fruition. These are arguments best addressed to the Legislature. By this decision, we simply enforce the legislative intent expressed in the language of CEQA, and in particular Public Resources Code sections 21090 and 21166, as those statutes apply to the Town's redevelopment plan EIR.

Because we reverse the trial court's judgment on the ground discussed above, we do not reach any of the other arguments presented by plaintiffs. Also, our ruling in the CEQA appeal nullifies the trial court's order denying plaintiffs' motion to tax costs. (*Monson v. Fischer* (1933) 219 Cal. 290, 291 [26 P.2d 6].)

REDEVELOPMENT APPEAL (Case No. C031043)

I

*Standard of Review*

The trial court determined that the Town adopted the redevelopment plan in the manner required by law and substantial evidence existed in the administrative record supporting the Town's findings of blight. The trial court was required to disregard any error, irregularity, or omission which did not affect the substantial rights of the parties. (Code Civ. Proc., § 866.)

"[T]he proper standard of review requires us to decide whether substantial evidence supports the judgment of the trial court . . . ." (*County of Riverside v. City of Murrieta* (1998) 65 Cal.App.4th 616, 620 [76 Cal.Rptr.2d 606].) Since the trial court affirmed the findings of the Town on the basis of substantial evidence in the administrative record (see *In re Redevelopment Plan for Bunker Hill* (1964) 61 Cal.2d 21, 39-41, 45-50 [37 Cal.Rptr. 74, 389 P.2d 538]), our task is virtually identical to the trial court's.

Defining substantial evidence, one court has well noted: "[I]f the word 'substantial' means anything at all, it clearly implies that such evidence must

be of ponderable legal significance. Obviously the word cannot be deemed synonymous with 'any' evidence. It must be reasonable in nature, credible, and of solid value; *it must actually be 'substantial' proof of the essentials which the law requires in a particular case."* (*Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54], italics added.)

Accordingly, a local agency's findings in support of its adopting a redevelopment plan are not conclusive. "The Community Redevelopment Law has established factors to be considered in determining whether an area is blighted, and it is the court's role to ensure those factors are taken into account. In short, the courts are required to be more than rubber stamps for local governments." (*Emmington v. Solano County Redevelopment Agency* (1987) 195 Cal.App.3d 491, 498 [237 Cal.Rptr. 636].)

Unlike CEQA, which required substantial evidence in the administrative record demonstrating only that the EIR provided a reasonable, good faith discussion of the potential impact, the Community Redevelopment Law requires substantial evidence in the administrative record demonstrating the existence of specific characteristics of urbanization and blight. (Health & Saf. Code, §§ 33030, 33031, 33320.1.) In some instances, the statute requires a finding of a nexus, to borrow a term from takings jurisprudence, between a particular characteristic being reviewed and the actual condition being caused. If the specific finding required by the Community Redevelopment Law cannot be made from the evidence in the administrative record, the evidence is not " 'substantial' proof of the essentials which the law requires" and the finding is not supported by substantial evidence. (*Estate of Teed, supra,* 112 Cal.App.2d at p. 644.)

II

*Elements of Appeal—Findings Establishing Blighted Area*

■ To approve the redevelopment plan, the Town Council had to find, among other things, that the area proposed to be subject to the redevelopment plan, the Project Area, is "a blighted area." (Health & Saf. Code, § 33367, subd. (d)(1).) To qualify as a blighted area, the Project Area must satisfy each of the following requirements:

1. The area is "predominantly urbanized." (Health & Saf. Code, § 33030, subd. (b)(1).)

2. The area is "characterized" by one or more statutorily defined *physical* conditions that cause blight. (Health & Saf. Code, § 33030, subd. (b)(2)(A).)

3. The area is "characterized" by one or more statutorily defined *economic* conditions that cause blight. (Health & Saf. Code, § 33030, subd. (b)(2)(A).)

4. The combination of physical and economic conditions causing blight is "so prevalent and so substantial that it causes a reduction of, or lack of, proper utilization of the area to such an extent that it constitutes a serious physical and economic burden on the community which cannot reasonably be expected to be reversed or alleviated by private enterprise or governmental action, or both, without redevelopment." (Health & Saf. Code, § 33030, subd. (b)(1).)[7]

An area that meets all of the conditions above may, in addition, be characterized by inadequate public improvements, parking facilities, or utilities. (Health & Saf. Code, § 33030, subd. (c).)

The trial court found there was substantial evidence in the administrative record based on which the Town could find the Project Area was a blighted area. Plaintiffs claim substantial evidence does not exist to support each of the statutory elements required for the Project Area to qualify as a blighted area. We conclude no substantial evidence exists based on which the Town and the trial court could find the Project Area is predominantly urbanized and suffers from the statutorily defined physical conditions that cause blight. We explain below why this is so. Since the Town and trial court's findings cannot establish all of the requirements necessary to show the existence of a blighted area, the Town's adoption of the redevelopment plan must be vacated in its entirety. We thus need not review the other arguments raised by plaintiffs against the redevelopment plan.[8]

---

[7]Although not pertinent to this case, in lieu of the second and third requirements (being characterized by economic and physical conditions causing blight), the area may instead be characterized by the existence of subdivided lots of irregular form and shape and inadequate size for proper usefulness and development that are in multiple ownership. (Health & Saf. Code, § 33030, subd. (b)(2)(B).)

[8]Plaintiffs initially fault the Town's use of a structural exterior survey to determine the existence of blight, claiming it resembled a methodology rejected in *Gonzales v. City of Santa Ana* (1993) 12 Cal.App.4th 1335, 1342-1345 [16 Cal.Rptr.2d 132]. The *Gonzales* court did not fault the use of a structural exterior survey as a per se improper methodology. Rather, it stated the survey in that case did not by itself result in sufficient evidence to support a finding of blight. (*Id.* at p. 1345.)

The Community Redevelopment Law does not prescribe a particular methodology. At issue here is not whether use of a survey was appropriate, but whether whatever methods the Town used to document the existence of blight resulted in substantial evidence supporting the statutorily required elements of a blighted area.

## III

### *Predominantly Urbanized*

The trial court determined substantial evidence supported the Town's finding that the Project Area was predominantly urbanized. Plaintiffs claim no substantial evidence supports the Town's finding. We agree with plaintiffs.

A predominantly urbanized project area is one where not less than 80 percent of the land: (1) has been or is "developed for urban uses"; (2) is characterized by the existence of subdivided lots of irregular form and shape and inadequate size for proper usefulness and development that are in multiple ownership; or (3) is an integral part of one or more areas developed for urban uses which are surrounded or substantially surrounded by "parcels" which have been or are "developed for urban uses." (Health & Saf. Code, § 33320.1, subd. (b).) A "parcel" is considered "developed" if it is developed in a manner consistent with zoning or otherwise permitted by law. (Health & Saf. Code, § 33320.1, subd. (c).)

The town council found the Project Area was predominantly urbanized based on evidence contained in the Final Report. The Final Report relied upon the building survey to state the Project Area consisted of 1,139 acres, 167.10 of which (or 14.67 percent) were vacant. The Final Report concluded the remaining nonvacant land (85.33 percent) was thus "urbanized." Besides documenting the amount of vacant land, the Final Report states the Project Area "may be considered predominantly urbanized as all properties are an integral part of an area developed for urban uses."

The Town also claims the building survey determined approximately 138 acres of the 167 vacant acres existed within urbanized areas. The Town argues vacant parcels in "urban areas" are "deemed 'urbanized'" under Health and Safety Code section 33320.1, subdivision (b)(3). Based on this theory, the Town believes, and the trial court so held, the Final Report actually underestimated the amount of urbanized land, and the correct figure should be 97 percent, or 1,110 acres of the total 1,139-acre Project Area.

At trial, plaintiffs claimed the Final Report's evidence of urbanization consisted only of conclusions without evidentiary support. Plaintiffs also believe the Final Report wrongly inflates the amount of urbanized land in the Project Area. They claim 84 acres of land used as a golf course at the Lodestar resort, 74 acres of undeveloped land at the community college site, and 120 undeveloped acres surrounding the airport were improperly determined to be nonvacant, and thus urbanized, land.

The term "urban" is "not fixed, objective, or easily ascertainable." (*County of Riverside v. City of Murrieta, supra,* 65 Cal.App.4th at p. 623.) At a minimum, however, the mere fact that property is not vacant or is developed in accordance with its zoning does not by itself render the property developed for urban uses. Lands that are not vacant may be developed for uses that are not urban uses. (*Id.* at p. 624.) The Final Report's conclusion that 85 percent of the land is urbanized simply because it is not vacant fails to account for this distinction, and thus does not by itself constitute substantial evidence on which the Town could rely to determine the extent of the Project Area's urbanization.

To claim the nonvacant parcels are developed for urban uses, the Town points us to a table in the Final Report compiled from the field survey cataloging and comparing the amounts of different types of uses in the Project Area. The Town also directs us to the general plan land use map depicting the land use designations assigned to properties in the Project Area, and a map prepared by plaintiffs at trial depicting in color the parcels the Town claimed were vacant and nonvacant. The approach is flawed because, as we discuss below, we cannot determine in this case whether *parcels* designated institutional by zoning or resort by the general plan, for example, or even nonvacant by the Town staff are actually "lands developed for urban uses."

As to the specific properties challenged by plaintiffs, the entire Lodestar golf course and all of the community college parcel were determined in the building survey not to be vacant and thus urbanized. The Final Report also claimed all of the land at the airport was urbanized. Regarding these properties, the issue, as with all properties claimed by the Town to be urbanized, is whether substantial evidence exists in the administrative record showing that each of these lands was either developed for urban uses or was an integral part of an area of land developed for urban uses that was itself substantially surrounded by parcels of land developed for urban uses.

A. *Lodestar golf course.*

Analysis of the Lodestar golf course requires additional background information. Lodestar is a proposed 222-acre mixed-use destination resort. The EIR for the project described the project's site as follows: "The site . . . is for the most part covered with Sierran Upper Montane Forest. This plant community is characterized by tall conifers that include Jeffrey pine, white fir, and red fir. *The vast majority of the forested site is undeveloped* with the exception of a few residences and a number of informal trails and dirt roads." (Italics added.)

According to the Lodestar at Mammoth Master Plan, adopted by the town council in 1991 and revised in 1992, the Lodestar project would result in the construction of 75 acres of residential units, 10 acres of hotel units, 5 acres of commercial uses, 12 acres of roads, 5 acres of open space, and the approximately 110-acre golf course. The EIR described the golf course as a "mountain style" golf course constructed through the entire site. Numerous ponds and lakes would be developed within the course. Of the lands designated for the golf course and open space, approximately 78 acres would be cleared, leaving 37 acres of natural open space buffer between fairways and adjacent uses. All trees exceeding 36 inches diameter breast height were to be considered for retention within the fairway areas.

Other than the construction of some or all of the golf course and one building on the course (apparently a club house with a parking lot), there has been no implementation of the Lodestar master plan. Except for the areas used as a golf course, the project site thus presumably retains its forested, undeveloped character.

The Town did not include the entire Lodestar project site within the redevelopment Project Area. The Lodestar master plan land use diagram shows the area of the project included in the redevelopment Project Area, a parcel of roughly 80 acres plus two other parcels, was approved to contain eight of the golf course's 18 holes. However, the land use map also shows that same area of the project was approved to contain, in addition to part of the golf course, 30 acres of residential units (a total of 380 units), 10 acres of hotel use (2 hotels containing a total of 500 units) and 5 acres of commercial use (totaling 80,000 square feet).

These 45 acres remain undeveloped, yet the Town classified them as nonvacant and included them as urbanized lands because they were located within the same assessor's parcels as the eight holes of the golf course. Since the golf course was consistent with the parcels' zoning, the Town argues subdivision (c) of Health and Safety Code section 33320.1 allowed the parcels in their entirety to be considered as developed for urban uses.

Subdivision (c) of Health and Safety Code section 33320.1 reads: "For purposes of this section, a parcel of property as shown on the official maps of the county assessor is developed if that parcel is developed in a manner which is either consistent with zoning or is otherwise permitted under law." The Town reads subdivision (c) as deeming *all* of a parcel developed if only a *portion* of the parcel is developed. The statute's language does not support the Town's interpretation. Subdivision (c) is not concerned with the extent of development. It says nothing of deeming a partially developed parcel to be a

fully developed parcel. Thus, subdivision (c) does not permit us to deem the undeveloped portions of a parcel to be "land . . . developed for urban uses." (Health & Saf. Code, § 33320.1, subd. (b)(1).)

Past amendments to Health and Safety Code section 33320.1 support this reading of subdivision (c) and its application here. In 1983, the Legislature sought to respond to a practice by some redevelopment agencies which had abused the redevelopment process by forming project areas that included significant amounts of unblighted and vacant land. (See Assem. Com. on Revenue and Taxation, Analysis of Assem. Bill No. 1545 (1983-1986 Reg. Sess.) Apr. 18, 1983, pp. 5, 8; Assem. Republican Caucus files (1983) Assem. Bill No. 1545 (1983-1984 Reg. Sess.)).)[9] To remedy this problem, the Legislature chose to require the project area to be predominantly urbanized. It defined that phrase to mean in part that "not less than 80 percent of the privately owned property in the project area has been or is developed for urban uses, . . . or is an integral part of an area developed for urban uses." (Stats. 1983, ch. 1324, § 1, p. 5352.)

By 1992, the Legislature had evidence showing some redevelopment agencies continued to form project areas encompassing large tracts of vacant land, despite the statutory amendments adopted in 1983. (Sen. Local Gov. Com., Analysis of Sen. Bill No. 1711 (1991-1992 Reg. Sess.) Apr. 13, 1992, p. 6 (Senate Bill No. 1711); (Sen. Local Gov. Com. files (1992) Sen. Bill No. 1711).) As a result, the Legislature adopted Senate Bill No. 1711 to tighten further the definition of "predominantly urbanized" in three respects. (Health & Saf. Code, § 33320.1; see Stats. 1992, ch. 1356, § 4, p. 6777.)

First, Senate Bill No. 1711 replaced the word "property" with the word "land." (Health & Saf. Code, § 33320.1, subd. (b).) Second, it required 80 percent of all land in the project area, not just privately owned property, to be urbanized. (*Ibid.*) Third, in order for vacant land to qualify as urbanized because it was an integral part of an area developed for urban uses, Senate Bill No. 1711 required the area developed for urban uses, of which the vacant land was an integral part, to be itself "surrounded or substantially surrounded by parcels which have been or are developed for urban uses." (Health & Saf. Code, § 33320.1, subd. (b)(3).)

Senate Bill No. 1711's replacement of the word "property" with the word "land" is significant. Although land is a type of property (see Civ. Code, § 658), the term "property" generally refers to a person's "right to

---

[9]Assembly Bill No. 1545 was ultimately vetoed by the Governor, but not before its provisions amending Health and Safety Code section 33320.1 were adopted by the Legislature as part of Assembly Bill No. 322 (1983-1984 Reg. Sess.). That statute became law without the Governor's signature. (Stats. 1983, ch. 1324, § 1, p. 5351.)

possess, use, and enjoy a determinate thing (either a tract of land or a chattel); the right of ownership." (Black's Law Dict. (7th ed. 1999) p. 1232.) Parcels divide land into tracts, for purposes of identification and ownership. (*Id.* at p. 1137.)

By contrast, "[l]and is the material of the earth, whatever may be the ingredients of which it is composed . . . and includes free or occupied space . . . ." (Civ. Code, § 659.)

■ The Legislature's use of the term "land" instead of the words "property" or "parcel" as part of its continuing attempt to limit the amount of vacant land included in a project area demonstrates an intent to ensure 80 percent of all of the land, irrespective of parcel lines, is predominantly urbanized. By using the term "land," the Legislature attempted to ensure a parcel line would not be used to allow vacant nonblighted lands to be included in redevelopment project areas.

The facts of this case exemplify the misuse of redevelopment power the Legislature sought to curb. The Town sought to include in the Project Area undeveloped and obviously nonblighted land which is planned and approved for extensive private development. The touchstone of redevelopment is the elimination of blight on developed lands, not the instigation of economic development on forested lands. (See Health & Saf. Code, §§ 33030, subd. (a), 33035, 33036.)

The Town thus violated Health and Safety Code section 33320.1 by not determining how much of the golf course land was developed for an urban use. It was improper to determine that the entire parcels containing the golf course were urbanized merely because a portion of the lands were developed with the golf course. The undeveloped lands should not have been included with the lands developed with the golf course for purposes of calculating lands developed for urban uses under Health and Safety Code section 33320.1, subdivision (b)(1).

This, however, does not end our analysis of the Lodestar golf course. Approximately half of the Lodestar resort included in the Project Area was developed with the functioning golf course. Plaintiffs question whether the developed course itself was properly considered to be an urban use simply because it was a nonvacant use consistent with zoning. ■ "Urban is defined as 'of, relating to, characteristic of, or taking place in a city . . . constituting or including and centered on a city . . . of, relating to, or concerned with an urban and specif. a densely populated area . . . belonging or having relation to buildings that are characteristic of cities . . . .' [Citations.]" (*Honey Springs Homeowners Assn. v. Board of Supervisors* (1984) 157 Cal.App.3d 1122, 1140 [203 Cal.Rptr. 886].)

The term "urban" thus refers more to the location and "varying characteristics" of a use than to the type of use. (*Honey Springs Homeowners Assn. v. Board of Supervisors, supra*, 157 Cal.App.3d at p. 1141.) ■ For example, a residential dwelling can exist either in an urban area or in a rural area. In either locale, the dwelling can be large or small and, in this era, will likely be served by many public utilities. The fact that it is a developed dwelling does not make the dwelling an urban use. Rather, it is the location and characteristics of the dwelling and its environs that may make the use an urban use. One would more likely conclude a residential dwelling unit located on the 10th floor of a high-rise apartment building in a downtown area served by mass transit is an urban use, while a residential dwelling unit located on a 10-acre parcel in a area devoted to agricultural uses is not an urban use.

So it is with golf courses. The mere fact that land is developed as a golf course does not conclusively render the use an urban use for purposes of redevelopment. Here, this golf course is designed as a mountain-style course with significant amounts of natural and preserved forest lands and water features interspersed throughout the course. Further, the course was developed on what was otherwise undeveloped forest land, and continues to be surrounded by undeveloped forest land. The characteristics of this golf course can hardly be related to or characteristic of a city or a densely populated area. We conclude there is no substantial evidence on which the town council could determine the Lodestar golf course was an urban use.

As a result of our determining the Lodestar golf course is not an urban use, it becomes clear the undeveloped portions of Lodestar cannot qualify as urbanized pursuant to Health and Safety Code section 33320.1, subdivision (b)(3). These undeveloped lands may be an integral part of the golf course project, but they are not an integral part of lands developed for urban uses.

B. *Community college site.*

For the same reasons it was improper for the Town to classify the undeveloped lands of the golf course parcels as urbanized, it was also improper for the Town to classify the undeveloped 74 acres of the 76-acre college site as developed and urbanized.

A 1994 EIR evaluated the likely impacts from a proposed development of the college site. The proposed project called for construction of a complete college campus on the site. The college would eventually consist of an 84,000-square-foot college center with classrooms, labs, and a library; a 56,000-square-foot cultural center; an 80,000-square-foot upper division college facility; a 75,000-square-foot student housing facility; and a 100,000-square-foot facility for the Mammoth Unified School District.

The EIR described the site of this proposed development as follows: "The entire site and all the area south of it are U.S. Forest Service public

lands. . . . The 80+-acre project site is a rolling, northeastward sloping, rectangular parcel . . . . The site is generally covered with natural vegetation consisting of sparse Jeffrey pine trees with moderate to dense manzanita and sagebrush ground cover. The topography, originally a glacial moraine, has many large boulders (up to 15′+- diameter). . . . *The project site itself is completely vacant of development*; only some undesignated foot trails are present." (Italics added.)

The Town does not dispute that only one building has been built on the site and approximately 74 acres remain vacant. The Town, however, claims, and the trial court found, the statute deems the entire site to be developed because two acres of the parcel are developed according to zoning and because the entire parcel is an integral part of an area developed for urban uses that is itself surrounded by urban uses.

As shown above, the Town's and trial court's reading of the statute is incorrect. The vacant acreage is not to be counted as urbanized merely because it is part of a parcel that has been partially developed consistent with zoning. Further, the redevelopment project area map and the EIR show the site is not surrounded by parcels developed for urban uses. At least two sides of the rectangular parcel are not adjacent to any development at all. Therefore, there is no substantial evidence by which the town council could have determined the 74 vacant acres were urbanized land.

C. *The airport.*

Plaintiffs similarly claim 120 acres of the 202-acre airport site were undeveloped and should not have been considered as developed. The Town did not include the airport in its building survey. Rather, it relied upon the 1988 Mammoth/June Lakes Airport Master Plan Report and the 1986 Mammoth/June Lake Airport Land Use Plan EIR to make the findings necessary to include the airport in the Project Area.

The Town included all of the 202-acre airport site in the Project Area as nonvacant urbanized land without determining how much of the airport land had actually been developed for urban uses. The Town argues the area is deemed predominantly urbanized because it is partially developed in a manner permitted by law. As we have already explained, the mere fact that part of land is developed consistent with zoning does not deem the entire land area under review developed for urban uses.

Relying on a description of existing facilities contained in the 1986 airport land use plan EIR, plaintiffs determined 74 acres of the airport were

developed and 128 acres were undeveloped. In their briefs before us, plaintiffs claim 85 acres are developed. The Town argues plaintiffs improperly excluded so-called safety setbacks and safety zones as well as the land between the various facilities, such as the land between the runways, the taxiways, and the terminal building from their calculation of developed land.

Citing to plaintiffs' determinations and the same master plan report's list of facilities but to nothing more, the Town states at least 130 acres are developed, excluding setbacks, safety zones and the areas between buildings. The Town likely excludes setbacks, safety zones, and areas between existing buildings from its calculation for the same reason plaintiffs did: those measurements are not included in the master plan report. At a minimum, however, the Town's calculations admit all 202 acres of the airport land are not developed for urban uses.

Furthermore, we cannot determine whether the land the Town claims is developed includes lands the 1986 airport land use plan EIR and the 1988 master plan report described as: (a) an unspecified amount of "[u]ndeveloped land in the present hangar area," which the airport anticipates developing for additional hangar areas; and (b) 7.8 acres of undeveloped land on the airport site leased as of August 1988 for construction of a hotel. These points demonstrate the town council did not have substantial evidence from which it could determine all 202 acres of the airport were developed for urban uses.

The Final Report states the airport is an integral part of an area developed for urban uses "although this area is not bounded by urban uses due to the nature of land use concerns associated with aviation, which for safety reasons have limited urban development in flight paths." This statement admits the airport does not qualify as urbanized land under subdivision (b)(3) of Health and Safety Code section 33320.1. The fact that this use is an airport does not exempt the use from the statutory requirement that to qualify under subdivision (b)(3), the vacant areas must be part of an area developed for urban uses which is itself surrounded by parcels that have been developed for urban uses. Thus, there was insufficient evidence in the administrative record to permit the town council to find the entire 202-acre airport to be developed for urban uses.[10]

---

[10]At trial, plaintiffs sought to augment the administrative record. One of the documents plaintiffs sought to include in the record was an airport expansion subsequent EIR, prepared in 1997. The trial court denied plaintiffs' request. Plaintiffs renew their motion before us, and we, too, deny it as it is unnecessary for purposes of our decision. However, the Town cites to language in the airport expansion subsequent EIR as evidence of urbanization at the airport. We cannot rely on evidence which was not admitted into the trial. Even if we could, the

In summary, the Town improperly deemed all nonvacant land as developed for urban uses. The Town also improperly determined the approximately 80 acres of the Lodestar project included in the Project Area, 74 acres of the 76-acre community college site, and all 202 acres of the airport were urbanized under either subdivision (b)(1) or subdivision (b)(3) of Health and Safety Code section 33320.1. As a result, there is no substantial evidence to permit the trial court to uphold the Town's finding that 80 percent of the Project Area was predominantly urbanized.

## IV

### *Physical Conditions That Cause Blight*

To be a blighted area, the Project Area must be characterized by one or more statutorily defined *physical* conditions that cause blight. (Health & Saf. Code, § 33030, subd. (b)(2)(A).) Physical conditions that cause blight are defined as follows:

"(1) Buildings in which it is unsafe or unhealthy for persons to live or work. These conditions can be caused by serious building code violations, dilapidation and deterioration, defective design or physical construction, faulty or inadequate utilities, or other similar factors.

"(2) Factors that prevent or substantially hinder the economically viable use or capacity of buildings or lots. This condition can be caused by a substandard design, inadequate size given present standards and market conditions, lack of parking, or other similar factors.

"(3) Adjacent or nearby uses that are incompatible with each other and which prevent the economic development of those parcels or other portions of the project area.

---

evidence now offered by the Town does not support its position. The airport expansion subsequent EIR claims the airport now intends to construct 100 permanent hangars instead of the 86 forecast in the 1988 master plan, and forecasts the hotel to have 250 units instead of the 150 originally planned. The hotel now will apparently be built at a different location on the airport site. The revised plan also calls for 2 acres of retail use not planned in the 1988 master plan, and a total of 694 automobile parking spaces, 638 more than currently exist and 384 more than planned to be constructed in the 1988 master plan. The airport expansion subsequent EIR claims this new development will occur on lands "already disturbed and in use for airport operations." The Town claims this language confirms the airport is fully urbanized. The maps depicting these proposed improvements, however, do not show the lands are in use for airport operations. Furthermore, labeling the land as "disturbed" did not inform the town council whether the land was "developed for urban uses." The cited materials do not support the Town's argument.

"(4) The existence of subdivided lots of irregular form and shape and inadequate size for proper usefulness and development that are in multiple ownership." (Health & Saf. Code, § 33031, subd. (a).)

 Plaintiffs claim no substantial evidence supports the Town's findings of physical conditions that cause blight. Two technical matters complicate our analysis on these issues. First, when the Town adopted its findings of conditions of blight in Ordinance No. 97-08, it did not in each instance use the statutory language defining conditions that can cause physical blight. Second, plaintiffs continually refer in their briefs to evidence in the Final Report as "findings," when instead the facts and information contained in the Final Report are the evidence used to support the findings contained in Ordinance No. 97-08.

We will view plaintiffs' claims as challenges to the evidence supporting the findings of Ordinance No. 97-08, as those findings reflect the statutorily defined conditions of blight. Further, we must determine whether the Town substantially complied with the legislative requirements. We must also determine whether the findings of Ordinance No. 97-08 are supported by substantial evidence demonstrating the Project Area can be characterized by the existence of the statutorily prescribed physical conditions of blight. (*Sanguinetti v City Council* (1965) 231 Cal.App.2d 813, 818 [42 Cal.Rptr. 268].)

A. *Unsafe or unhealthy buildings.*

Plaintiffs assert the evidence does not support a finding that the project area is characterized by "[b]uildings in which it is unsafe or unhealthy for persons to live or work." (Health & Saf. Code, § 33031, subd. (a)(1).) We agree with plaintiffs, as we shall explain.

Although the Town did not make this specific finding, it made the following findings regarding the condition of buildings in the Project Area:

"Aging and deteriorating buildings requiring substantial rehabilitation or extensive reconstruction to correct serious building code violations; . . .

"Aging and deteriorating buildings of defective or substandard design or construction; . . .

"Buildings which are in need of seismic upgrading to meet current seismic building code standards . . . ."

To make these findings, the Town relied primarily on the building condition survey of all buildings in the Project Area (except the airport), building

department records, and a 1992 housing condition survey. The Final Report approved by the Agency and forwarded to the town council as part of the redevelopment plan adoption process summarized the results of the building condition survey. The building survey did not specifically conclude whether buildings were unsafe or unhealthy for human occupancy. Rather, the building survey determined, among other things, whether structures on a parcel suffered from building code violations, were deteriorated or dilapidated, suffered from defects in design or construction, or whether the buildings complied with seismic safety codes. Plaintiffs correctly claim these factors as defined and reviewed in the building survey and the housing condition survey do not constitute substantial evidence of the existence of buildings that are unsafe or unhealthy for human occupancy.

1. *Building code violations.*

The building survey determined less than 2 percent of the buildings in the project area suffered building code violations. For purposes of the building survey, a building code violation was defined as "[b]uildings or structures which have obvious health and safety building code violations which have been reported to officials of the Town of Mammoth Lakes Building Department. This includes construction which has not met current building codes and for which building permits and inspections were not obtained from the Town."

Plaintiffs claim this definition does not determine whether a building is unsafe for human occupancy. The Town argues, and the trial court found, the building survey's limitation to "obvious health and safety related violations" per se satisfies the statutory criterion of serious building code violations causing unsafe or unhealthy buildings. However, neither the Town nor its survey defines health and safety violations. The Town does not direct us to anywhere in statute or regulation that defines such violations.

Theoretically, all building codes are designed for the health and safety of a structure's occupants. There is nothing in the administrative record to explain how the survey's inclusion of only so-called health and safety violations limited the scope of the building survey to serious building code violations which created an unsafe building, as opposed to any code violation which may or may not result in an unsafe building.

While the phrase "health and safety" building code violations may mean something specific to building department personnel, the Final Report did not explain its meaning to the town council. The town council thus could not know whether the evidence of building code violations demonstrated the

existence of buildings that were unsafe or unhealthy for human occupation, nor can we.

Even if it could be determined that the violations reported in the building survey caused the relevant buildings to be unsafe, the survey showed less than two percent of the buildings and the parcels in the Project Area suffered from this defect. A developed area of land cannot be characterized as suffering from conditions causing physical blight merely because less than 2 percent of its buildings have serious building code violations.

*2. Deterioration and dilapidation.*

The building survey determined that approximately 29 percent of parcels in the Project Area were affected by buildings suffering from deterioration and dilapidation. The building survey claimed 324 buildings were so affected, or approximately 25 percent of the total number of buildings in the Project Area. For purposes of the building survey, deteriorated or dilapidated buildings were defined as structures "which show visible and obvious signs of dilapidation or deterioration on either the building exterior or interior construction. Examples might be severely deteriorated roofing or siding, foundation failures, peeling paint, dry rot and other physical evidence of unmaintained structures."

Plaintiffs argue the characteristic of deterioration and dilapidation, as defined by the building survey, does not demonstrate the existence of buildings unsafe for human occupancy. The Town responds, and the trial court agreed, that because the building survey defined "dilapidation" to include such factors as severely deteriorated roofing and foundation failures, its application resulted in locating buildings that were unsafe for humans.

The building survey's definition, however, also included such factors as "[peeling] paint, dry rot, and other physical evidence of unmaintained structures." To that extent, the definition is overbroad. Peeling paint, dry rot, and lack of maintenance need not by themselves result in an unsafe or unhealthy building. The breadth of the definition used in the building survey prevented the town council from determining whether the Project Area could truly be characterized as containing buildings unsafe for human occupancy due to their deteriorated or dilapidated condition.

The Town further relies upon the 1992 housing study as evidence of dilapidation. The Final Report claims the housing study concluded that 26 percent of the 596 housing units it evaluated in the Project Area were classified as "Average Minus," "Poor," or "Very Bad" and thus needed

rehabilitation. The actual housing study, however, is not a part of the record. Only the definitions of the classifications are included and they do not indicate how many houses were determined to be which classification, nor do they include a classification called "Very Bad." Thus, not all of the Final Report's claims regarding the housing study can be verified.

Furthermore, one cannot determine from the housing study's "Average Minus" classification whether such a housing unit is unsafe or unhealthy for human occupation. A house that exhibits each of the listed characteristics (single glazed windows needing repair, under-insulation, wood siding exteriors needing paint or repair, decks and stairs needing repair or replacement, doors without weather stripping, electric heating, and overall appearance lacking in maintenance) is not necessarily unsafe or unhealthy for human occupancy. We do not believe the Legislature intended a house constructed with single glazed windows and electric heating to constitute an unsafe house for purposes of redevelopment, even if the house was constructed in a community which can experience severe winter conditions.

The trial court noted the Final Report's statement that "[s]ince the housing condition survey in 1992 there has been a continuing lack of maintenance of residential units which exhibited signs of deterioration in 1992." The Final Report, however, also stated: "[T]he majority of the units are in need of moderate repair. *Basically the buildings are structurally sound* but are in need of one or more systems to be renovated." (Italics added.) We do not understand how a survey concluding housing units that in general lack efficient insulation but are structurally sound can be used as evidence showing the units are unsafe for human occupancy.

In short, the town council could not determine with reasonable certainty the existence or extent of buildings rendered unsafe due to deterioration or dilapidation based on the evidence in the administrative record.

3. *Defective design and substandard construction.*

The Final Report stated the building survey documented defective design or construction in 273 buildings, or about 21 percent of the buildings surveyed. The town council cited this as evidence of blight and found the Project Area included aging and deteriorating buildings of defective design or construction.

The building survey defined "defective design or construction of building" as structures "which have defects in design or construction which cause the structures to be non-functional or obsolete. Examples might include retail buildings with inadequate depths for retail display area, storage and rest

room facilities; buildings which are not energy efficient and expensive to operate lodging facilities which do not meet demands of today's tourist market, etc."

Whether a building has become nonfunctional or obsolete for its use under current market conditions does not indicate whether the building is unsafe or unhealthy for human purposes. This evidence does not support the town council's finding insofar as the evidence relates to existence of unsafe buildings in the Project Area.

4. *Buildings in need of seismic upgrading.*

The building survey stated 199 buildings existing on 38 percent of the parcels in the Project Area, or approximately 15 percent of the buildings in the Project Area, required seismic upgrading to meet current seismic building code standards. The building survey defined such buildings as those that did "not meet current seismic safety design and construction requirements of the 1994 Uniform Building Code and other applicable building codes in effect in the Town of Mammoth Lakes."

Plaintiffs argue the violation of a current seismic safety regulation did not per se result in a building unsafe or unhealthy for human occupancy. Both the Town and the trial court reasoned failure to meet current seismic safety building codes "is implicitly serious and unsafe."

A hypothetical example illustrates the difficulty with the trial court's reasoning. Suppose a building was erected in 1990 in full compliance with the 1988 Uniform Building Code's seismic safety regulations, and the building continues to comply with those regulations today. Under the Town's definition, this building would be classified as unsafe for human occupancy, even though by law the Town was prohibited from imposing the 1994 Uniform Building Code's requirements on the structure. (Health & Saf. Code, § 18938.5.)

Indeed, when the Legislature has granted authority to municipalities to require older structures to be retrofitted for purposes of seismic safety, it has required the local agency to demonstrate not just that the structure violated existing seismic safety codes, but that the structure would be "hazardous to life in the event of an earthquake . . . ." (Health & Saf. Code, § 19161.) The Town made no such showing here.

Based on the above, we find there is no substantial evidence on which the Town and the trial court could determine the Project Area was characterized

by the existence of buildings unsafe or unhealthy for human use and occupancy.

B. *Factors Preventing Economically Viable Use.*

Plaintiffs argue the evidence does not support a finding that the Project Area is characterized by "[f]actors that prevent or substantially hinder the economically viable use or capacity of buildings or lots." (Health & Saf. Code, § 33031, subd. (a)(2).) This characteristic "can be caused by a substandard design, inadequate size given present standards and market conditions, lack of parking, or other similar factors." (*Ibid.*)

On this point, the Town found the following conditions to exist in the Project Area:

"Aging and deteriorating buildings of defective or substandard design or construction . . . .

"Limited economically viable use or capacity of parcels due to substandard site design involving inadequate traffic circulation, access, and truck loading areas, inadequate snow storage areas and a shortage of parking . . . .

"Limited economically viable use or capacity of subdivided lots due to substandard size and irregularly-shaped parcels . . . ."

Two of the Town's findings do not satisfy the requirements of the statute. Physical conditions causing blight do not result just from factors that *limit* a parcel's economic viability; they arise from factors that "*prevent* or *substantially hinder*" a parcel's economic viability. (Health & Saf. Code, § 33031, subd. (a)(2), italics added.) ▆▆ Determinations of blight are to be made on the basis of an area's existing use, not its potential use. Redevelopment " 'never can be used just because the public agency considers that it can make a better use or planning of an area than its present use or plan.' " (*Sweetwater Valley Civic Assn. v. City of National City* (1976) 18 Cal.3d 270, 278 [133 Cal.Rptr. 859, 555 P.2d 1099].)

Thus, factors limiting a building or lot that is currently enjoying an economically viable use or capacity from achieving potentially greater economic returns are outside the scope of subdivision (a)(2) of Health and Safety Code section 33031. ▆▆ Rather, the evidence must show the existence of physical conditions (such as design, size, lack of parking, etc.) that prevent or substantially hinder an existing use or capacity of a lot or building from achieving or maintaining economic viability.

Furthermore, the statute's language shows the Legislature was not interested in merely the existence of the suggested physical conditions. Substantial evidence must show the physical factors actually prevent or substantially hinder an existing use or lot's economic viability. For example, many economically viable uses, particularly in urban areas, lack sufficient automobile parking. Nevertheless, such uses continue to be profitable, demonstrating lack of parking for those uses is not a factor preventing or hindering their economic viability. They possibly could be more profitable with more parking, but subdivision (a)(2) of Health and Safety Code section 33031 applies only if those uses and lots suffer economic nonviability now. Accordingly, contrary to the Town's argument, the record must demonstrate substantial evidence quantifying the effect the physical condition has on the economic viability of the existing use or capacity of the building or lot.

On this criterion of physical condition affecting economic viability, plaintiffs challenge the Town's evidence relating to defective design or construction, inadequate lot sizes, and substandard site design. The Town's building survey found approximately 23 percent of the parcels, or approximately 21 percent of the buildings, suffered from defective design or construction; approximately 15 percent of the parcels in the Project Area were inadequately sized; and approximately 59 percent of the parcels experienced "substandard site design."

On each of these categories, plaintiffs claim the record contains no evidence quantifying how the existence of these physical conditions actually renders the current use or capacity of the building or lot economically nonviable. We agree. Nowhere in the record is there substantial evidence by which the town council could find the existence of these conditions prevented or substantially hindered the economic viability of the existing uses and capacities of the lots and buildings in the Project Area.

The Town argues that accurately quantifying such impacts would be prohibitively expensive and would invade the privacy rights of those from whom the agency obtains economic information. That is an argument the Town must take to the Legislature. The statute clearly intends for evidence of the physical condition's impact on economic viability to be in the record to support the finding. We are confident if a building or lot is truly economically nonviable, the Town can find and present substantial evidence demonstrating that state of affairs in a manner acceptable to the private property or business owner.

The Town claims the Final Report's presentation of the Town's sales tax and transient occupancy tax revenues over the past five years provides

substantial evidence of the physical conditions' economic impact. We disagree. This evidence shows tax receipts from the entire Town, not just the Project Area. Furthermore, the town council could not determine from the evidence that the flat rate of tax revenues was caused by defective design or construction, inadequate lot sizes, or substandard site design. The rate of revenues could have been caused by a myriad of different reasons. This evidence is far too disconnected to demonstrate the lack of economic viability due to the physical factors here at issue.

We briefly review additional arguments raised regarding each of the physical factors.

### 1. *Defective design or construction.*

The survey defined the factor of defective design or construction as "[s]tructures which have defects in design or construction which cause the structures to be non-functional or obsolete. Examples might include retail buildings with inadequate depths for retail display area, storage and rest room facilities; buildings which are not energy efficient and expensive to operate lodging facilities which do not meet demands of today's tourist market; etc."

The trial court declared a "non-functional or obsolete building is obviously one whose economically viable use or capacity has been substantially hindered." However, the Town's definition of a nonfunctional or obsolete building is overbroad. The mere fact a building may not be energy efficient or may be expensive to heat does not necessarily render the current use or capacity economically nonviable. Energy inefficiency could be substantial evidence if the Town quantifies how the expense of an energy-inefficient building renders the current use economically nonviable.

### 2. *Inadequate lot sizes.*

The survey defined "inadequate lot sizes" to mean the "parcel does not permit full development of the lot coverage and intensity of use permitted by the zoning district in which it is located because the lot size is too small to meet zoning requirements."

The trial court stated buildings and lots with this characteristic "are more limited in their economic utility than properties without such conditions." The issue before the Town, however, was not whether, as the Town frames it, "if the lot were bigger, the owner would be allowed to develop it more under current zoning." The issue was whether the current lot size rendered

the current use or capacity of the lot or its buildings economically nonviable. The survey did not address this issue.

A lot is not deemed economically nonviable just because it cannot be developed to the maximum size and intensity allowed under zoning. Many uses of land can be economically viable even though they are unable to expand to the maximum size and density allowed under their zoning classification.

3. *Substandard site design.*

The building survey did not specifically define "substandard site design," but defined "inadequate site improvement" as the situation when the "site improvements are substandard such as inadequate drainage facilities, landscaping, circulation and access, building siting, etc." The discussion in the survey noted this criterion also included the lack of truck loading areas, inadequate snow storage areas, and inadequate parking. The survey claimed approximately 58 percent of the parcels in the Project Area suffered from substandard site design.

Regarding parking, the survey claimed 95 percent of the parcels affected by substandard site design, or approximately 56 percent of all parcels in the Project Area, suffered from inadequate parking. The survey defined "inadequate parking" as the situation when a "site does not provide either adequate parking to serve the uses on the site or parking as required by the Town's Parking Ordinance."

The trial court found that the following passage from the Final Report demonstrated the economic effect of this physical characteristic: "Lack of parking and the resulting parking overflow from inadequate parking to sites which meet parking demand is a strong deterrent to economic development and business expansion, particularly for commercial and industrial uses. Combined with the inadequately sized lots, lack of parking and lack of adequate loading areas causes inaccessibility, traffic congestion and lost business."

However, there is nothing in the record demonstrating that *in fact* the lack of parking has actually resulted in decreased or lost business. Nowhere does the Town produce facts demonstrating that even one particular business has lost customers or revenue due to substandard site design. The language cited by the trial court from the Final Report is the conclusory type of "jargon" courts have criticized as making "no attempt at any specificity; the reasons appear to have emerged from the consultants' word processor without any

thought as to why any particular parcel . . ." is blighted under this criterion. (*Gonzales v. City of Santa Ana, supra,* 12 Cal.App.4th at p. 1346; see also *County of Riverside v. City of Murrieta, supra,* 65 Cal.App.4th at p. 627.)

The trial court also apparently relied on this additional language from the Final Report: "The Town of Mammoth Lakes has identified the lack of snow storage areas as a critical need during the ski season. The Town is located at an elevation of 8,000 feet and receives an annual average snowfall of 200+ inches a year. Clearing streets and parking lots of snow causes huge stock-piles of snow along the sides of roadways and within parking lots. This further reduces the available parking and loading areas."

Again, the Town fails to refer us even to one incident where it could factually prove the accumulation of snow on parking lots actually caused a use of property to be economically nonviable. We are sympathetic to the additional burdens born by an alpine community. However, the language of the Community Redevelopment Law sets an exacting standard communities must meet in order to establish a redevelopment project area. The evidence in the Final Report of factors preventing or substantially hindering the economically viable use or capacity of buildings or lots fails to meet that standard.

C. *Incompatible Uses.*

Plaintiffs argue the evidence does not support a finding that the Project Area is characterized by "[a]djacent or nearby uses that are incompatible with each other *and* which prevent the economic development of those parcels or other portions of the project area." (Health & Saf. Code, § 33031, subd. (a)(3), italics added.)

When the Town adopted Ordinance No. 97-08, it made no finding concerning the existence of adjacent incompatible uses existing in the Project Area. The issue, however, was raised in the Final Report. Plaintiffs challenge the sufficiency of evidence supporting the Final Report's conclusions on this issue.

The Final Report states the building survey determined approximately 8.5 percent of the parcels in the Project Area encompassing 55 buildings (approximately 4 percent of the total number of structures in the Project Area) suffer from adjacent incompatible uses. The building survey defined incompatible land uses to mean when the "parcel being considered is incompatible with adjacent land uses. An example might be single family residential use next to an auto repair shop."

The Final Report further explains: "In several of the cases cited the impact of commercial or industrial properties located adjacent to established single family neighborhoods is the cause of the land use incompatibility. Elsewhere, lack of adequate trash enclosures, absence of any landscaping or walls as physical buffers, and hours of operation where noise becomes a nuisance to neighboring residences constitute commonly encountered conflicts."

The trial court found the survey gave "a fair indication" of the use conflicts. Regarding the requirement that the incompatible use prevented economic development, the trial court stated the Town "was not required to quantify or detail the economic development impact, but only incorporate it as an element of the criteria."

The trial court erred on this point because the Town's criteria do not in fact incorporate any aspect of the impact incompatible uses would have on economic development. The criteria merely required the survey to document the existence of what the person conducting the survey believed to be incompatible uses. Its inquiry ended at that point.

A primary purpose of redevelopment is to eliminate blight which private enterprise can not. (Health & Saf. Code, § 33030, subd. (b)(1).) Interpreted from that legislative mandate, subdivision (a)(3) of Health and Safety Code section 33031 requires substantial evidence showing undeveloped or underdeveloped land is not being developed by the private market *because of* adjacent incompatible uses. Such evidence is wholly lacking in the record.

The Town cites various examples of incompatible uses tabulated in the survey. But nowhere does the Town show how these uses are preventing economic development. For all we know, despite their incompatibility, these uses are economically viable. There must be some evidence showing it is the existence of incompatible uses that creates the economic disincentive. The mere fact different types of uses are separated by inadequate landscaping or lack adequate trash enclosures, factors relied upon by the survey in determining incompatibility, does not illuminate the economic disincentive the statute seeks to identify.

It is apparent the Town lacked substantial evidence by which it could determine the Project Area was characterized by adjacent incompatible uses that prevented the economic development of those parcels or other portions of the Project Area.

D. *Inadequate Lot Size and Multiple Ownership.*

Plaintiffs claim the evidence does not support a finding that the Project Area is characterized by "[t]he existence of subdivided lots of irregular form

and shape and inadequate size for proper usefulness and development that are in multiple ownership." (Health & Saf. Code, § 33031, subd. (a)(4).

Adopting Ordinance No. 97-78, the town council found the Project Area was characterized by the following: "Limited economically viable use or capacity of subdivided lots due to substandard size and irregularly-shaped parcels . . . ."

At trial and on appeal, the Town concedes the survey did not generate evidence to support the finding of irregular lots in multiple ownership.

We thus find there is no substantial evidence on which the town council could determine the Project Area is characterized by any of the statutory conditions that can cause physical blight.

## V

### *Remaining Blight Arguments*

Because we have determined there is no substantial evidence to support the Town's determinations the Project Area was predominantly urbanized and suffered from at least one of the statutorily prescribed physical conditions which cause blight, there is no substantial evidence by which the Town could determine the combination of both physical and economic conditions causing blight are so prevalent they can only be remedied through redevelopment. (Health & Saf. Code, § 33030, subd. (b)(1).) We thus do not address the parties' arguments on this point, the existence of economic conditions causing blight, or the inclusion of the airport and the industrial park, two areas not contiguous to the main Project Area, in the redevelopment plan Project Area. The judgment of the trial court shall be reversed.

## VI

### *Costs at Trial*

Our disposition of the redevelopment appeal nullifies the trial court's order on costs in that action. (*Monson v. Fischer, supra,* 219 Cal. at p. 291.)

### DISPOSITION

The judgments of the trial court in both the CEQA appeal (case No. C029659) and the redevelopment appeal (case No. C031043), including the awards of costs, are reversed. The trial court is instructed to issue the

petitioned writ of mandate in the CEQA action and to enter judgment in the redevelopment action in favor of plaintiffs.

Plaintiffs are awarded their costs on appeal.

Blease, Acting P. J., and Sims, J., concurred.

A petition for a rehearing was denied August 21, 2000, and the opinion was modified to read as printed above. The petition of defendants and respondents for review by the Supreme Court was denied November 15, 2000. Kennard, J., was of the opinion that the petition should be granted.